HARVEST SAVINGS BANK a/k/a Harvest Savings Bank,
F.S.B., Plaintiff,

v.

ROI INVESTMENTS, a Wisconsin general partnership,
John R. Ammerman, Robert L. Klein, Defendants-
Appellants,

PAYNE AND DOLAN, INC., Defendant,

COMMUNITY NATIONAL BANK, Defendant-Respondent,

Richard SENN and Denise Senn, Defendants,

BANK OF SUN PRAIRIE, Interested Party-Appellant.

Court of Appeals

*No. 96–0998. Submitted on briefs December 9, 1996.—Decided
March 27, 1997.*

(Also reported in 563 N.W.2d 579.)

For the defendants-appellants the cause was submitted on the briefs of *Linda S. Balisle* of *Balisle & Roberson, S.C.* of Madison.

For the defendant-respondent the cause was submitted on the brief of *Daniel W. Stolper* and *Meg Vergeront* of *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

Before Dykman, P.J., Roggensack and Deininger, JJ.

DYKMAN, P.J.  ROI Investments (ROI) appeals from an order granting Community National Bank (CNB) the entire $235,380.20 surplus resulting from the foreclosure and sheriff's sale of a commercial office building owned by ROI. CNB included in its claim $58,131.69 for real estate taxes on the property that it paid after confirmation of the sheriff's sale and $15,252.75 in attorneys' fees incurred after August 3, 1995. ROI argues that: (1) CNB is not entitled to reimbursement for the real estate taxes paid from the surplus because CNB's mortgage was extinguished on the date of confirmation; and (2) the trial court erroneously exercised its discretion in awarding the $15,252.75 in attorneys' fees.

We conclude that CNB is not entitled to recover the real estate taxes paid from the surplus because its mortgage was extinguished on the date of confirmation. We also conclude that the trial court did not erroneously exercise its discretion in awarding

$15,252.75 in attorneys' fees if all fees were incurred prior to confirmation. We conclude, however, that because CNB's mortgage was extinguished upon confirmation of the sheriff's sale, CNB cannot recover from the surplus any attorneys' fees incurred after the date of confirmation. We therefore reverse and remand to the trial court for a redetermination of the distribution of the surplus.

## BACKGROUND

ROI owned a commercial office building on which Harvest Savings Bank (HSB) held a first mortgage and CNB held a second mortgage. ROI defaulted on the first mortgage, and HSB commenced a foreclosure action. The court entered a judgment of foreclosure on March 3, 1995. At the July 11, 1995 sheriff's sale, CNB was the highest bidder at $1,164,000.00. ROI filed a petition in bankruptcy on July 18, 1995.

On September 21, 1995, ROI and CNB entered into a stipulation in which ROI agreed that, as of October 31, 1995, it owed CNB $218,312.02 for principal, interest and late charges and $8,493.47 for attorneys' fees incurred between May 1, 1994 and August 3, 1995. The total amount for principal, interest and late charges was later increased to $220,590.02 when ROI did not make its October payment to CNB as anticipated at the time of the stipulation. Pursuant to the stipulation, the court lifted the automatic stay as it applied to CNB.

On November 14, 1995, the trial court confirmed the sale. After payment to HSB pursuant to its first mortgage, a surplus of $235,380.20 remained. CNB filed a claim for the surplus, claiming a total amount of $272,476.44. This amount represented the September stipulated amount plus interest; $15,252.75 in attor-

neys' fees incurred after August 3, 1995; $58,131.69 in outstanding real estate taxes on the property that CNB paid after confirmation of the sheriff's sale; and miscellaneous maintenance expenses submitted by the tenant of the commercial property.[1] On January 4, 1996, the trial court granted CNB's claim for the surplus, finding that ROI owed CNB the entire $272,476.44.

ROI appeals. ROI does not contest $199,092.00 of the surplus award. Rather, ROI objects only to the award of $58,131.69 for real estate taxes and $15,252.75 for attorneys' fees incurred after August 3, 1995.

## REAL ESTATE TAXES

ROI argues that CNB's mortgage was extinguished upon confirmation of the sheriff's sale, and therefore any real estate taxes paid by CNB after confirmation are not recoverable from the surplus. CNB argues that the covenants of its mortgage remained in effect until ROI's debt was paid in full. Whether CNB may recover the real estate taxes from the surplus is a question of law that we review *de novo*. *See First Wisconsin Trust Co. v. Rosen*, 143 Wis. 2d 468, 471, 422 N.W.2d 128, 129 (Ct. App. 1988).

Section 846.162, STATS., allows the parties to a foreclosure action and nonparty lienholders to file a claim for surplus proceeds. Section 846.162 provides in relevant part:

---

[1] These figures totalled $305,074.23. The building's tenant, however, held $32,597.79 in rent for September, October and November. This amount was credited to the amount CNB claimed from ROI.

> If there shall be any surplus paid into court by the sheriff or referee, any party to the action or any person not a party who had a lien on the mortgaged premises at the time of sale, may file with the clerk of court into which the surplus was paid, a notice stating that the party or person is entitled to such surplus money or some part thereof, together with the nature and extent of the party's or person's claim. The court shall determine the rights of all persons in such surplus fund . . . .

Section 846.162 is a procedural statute and does not create or affirm any rights or priorities in the surplus. *Rosen*, 143 Wis. 2d at 472, 422 N.W.2d at 129.

ROI argues that this case is analogous to *Hitchcock v. Merrick*, 18 Wis. 375 [\*357] (1864), in which the supreme court concluded that the mortgagee, who purchased the property at a foreclosure sale, could not recover in a suit against the mortgagor for unpaid taxes. We agree.

In *Hitchcock*, Thomas Hitchcock brought a foreclosure action against Merrick and obtained a judgment of foreclosure for $13,631.55 plus costs. *Id.* at 375-76 [\*357]. Hitchcock purchased the mortgaged property at the November 8, 1862 foreclosure sale, leaving a balance of $98.04 due on the judgment. *Id.* at 376-77 [\*357-58]. Merrick subsequently paid the $98.04 deficiency. *Id.* at 377 [\*358].

When Hitchcock purchased the property at the foreclosure sale, certain taxes and assessments on the property remained unpaid. *Id.* at 376 [\*357-58]. Several lots of the mortgaged premises had been sold for the unpaid taxes. *Id.* at 376 [\*358]. On December 20, 1862, Hitchcock paid $1,660.90 for the outstanding and unredeemed certificates of tax sales to protect his title. *Id.*

Hitchcock brought suit against Merrick to recover the $1,660.90 pursuant to a covenant in the mortgage. The covenant provided that the mortgagor must pay "all taxes and assessments of every nature that might be assessed upon the premises described therein, previous to the day appointed, in pursuance of any law of this state, for the sale of land for taxes." *Id.* at 375 [*357].

The supreme court rejected Hitchcock's claim, concluding that Hitchcock could not bring an action upon the covenant to pay taxes after extinguishment of the mortgage. *Id.* at 379 [*361]. The court reasoned:

> As part and parcel of the mortgage, the covenant to pay taxes expires with the mortgage. It is no more capable of separation from the mortgage than the mortgage from the debt. It ceases with the debt for the better protection of which it was made, and can perform no office after the debt has been paid. Now if this is true where the mortgagor voluntarily pays the debt, we think the same must be true where the mortgagee extinguishes the debt by buying in the mortgaged premises at the foreclosure sale. Both are payments, the one voluntary, the other compulsory under the mortgage. In either case the debt is satisfied, and the lien of the mortgage, to which the covenant is annexed, is extinguished.

*Id.* at 380 [*361-62].

Consistently, we conclude that ROI's covenant under the mortgage to pay taxes expired when CNB's lien was extinguished upon confirmation of the sheriff's sale. Because the covenant to pay taxes expired upon confirmation of the sale, CNB's payment of taxes

after confirmation cannot be recovered from the surplus.

CNB argues that *Hitchcock* is distinguishable because in that case the debt had been paid in full at the time the mortgagee paid the taxes on the property, while here the taxes were paid while the debt was still owing. We disagree with CNB's contention for two reasons. First, it is unclear from *Hitchcock* whether the debt had been paid in full when Hitchcock paid the taxes. The reported facts only provide that Merrick paid the $98.04 balance due on the judgment before commencement of Hitchcock's action against him to recover unpaid taxes; the facts do not provide whether Merrick paid the $98.04 before or after Hitchcock purchased the certificates of tax sales.

Second and more importantly, the *Hitchcock* court did not conclude that the covenant to pay taxes expired upon Merrick's payment of the $98.04 balance due. Instead, the court compared its facts to the situation in which a mortgagor voluntarily pays the debt in full and concluded that if a covenant to pay taxes expires when the debt is paid in full voluntarily, it must also expire when "the mortgagee extinguishes the debt by buying in the mortgaged premises at the foreclosure sale." *Id.* at 380 [*361-62]. Therefore, the determinative event was not Merrick's payment of the $98.04, but Hitchcock's purchase of the property at the foreclosure sale. Accordingly, ROI's covenant to pay taxes expired not when the debt was paid in full, but when CNB's purchase of the property was confirmed.

Our conclusion is supported by *First Wisconsin Trust Co. v. Rosen*, 143 Wis. 2d 468, 422 N.W.2d 128 (Ct. App. 1988). In *Rosen*, we reversed the trial court's award of $4,647.57 in surplus funds to two municipalities holding real estate tax liens on the foreclosed

property. Because the municipalities were not parties to the foreclosure action, their interests in the property were not "foreclosed" under § 846.17, STATS.[2] *Id.* at 473, 422 N.W.2d at 130. Therefore, the municipalities conceivably had access to two assets from which to satisfy their liens: the property and the sale proceeds. *Id.* The lienholders that had their interests foreclosed, however, only had access to the sale proceeds. *Id.* Under those circumstances, we concluded that it would be inequitable to allow the municipalities to receive surplus funds through § 846.162, STATS., to the detriment of other lienholders. *Id.*

Likewise, in this case the municipalities to which ROI owed real estate taxes were not parties to the action. Their interests were not foreclosed under § 846.17, STATS., and the property was sold subject to "any and all legal encumbrances upon the property, including but not limited to any outstanding real estate taxes." If CNB had not paid the real estate taxes, the municipalities still would have maintained a lien on the property under § 70.01, STATS.[3] And under *Rosen,*

---

[2] Section 846.17, STATS., provides in relevant part:

> Upon any such sale being made the sheriff or referee making the same, on compliance with its terms, shall make and execute to the purchaser, the purchaser's assigns or personal representatives, a deed of the premises sold, setting forth each parcel of land sold to the purchaser and the sum paid therefor, which deed, upon confirmation of such sale, . . . shall be a bar to all claim, right of equity of redemption therein, of and against the parties to such action, their heirs and personal representatives, and also against all persons claiming under them subsequent to the filing of the notice of the pendency of the action in which such judgment was rendered. . . .

[3] Section 70.01, STATS., provides in relevant part:

> Real estate taxes and personal property taxes are deemed to be levied when the tax roll in which they are included has been delivered to the local treasurer under s. 74.03. *When so levied*

the municipalities would not have been able to recover unpaid taxes from the surplus to the detriment of other lienholders. CNB cannot circumvent *Rosen* by paying the taxes itself and then adding the taxes to its surplus claim.

CNB argues that *Rosen* is distinguishable because in *Rosen* the mortgagee did not have a contractual agreement with the mortgagor under which the mortgagee could claim reimbursement for taxes, while CNB did. This argument fails to recognize, however, that at the time CNB paid the taxes, it also did not have a contractual agreement with the mortgagor under which it could claim reimbursement for taxes paid. As provided by *Hitchcock*, ROI's covenant to pay taxes ceased to exist when the mortgage was extinguished upon confirmation of the foreclosure sale.

CNB also argues that *Tobin v. Tobin*, 139 Wis. 494, 121 N.W. 144 (1909), dictates that we conclude that ROI's covenant to pay taxes survives until CNB's debt is paid in full. In *Tobin*, the court provided, "A mortgage is extinguished by payment of the debt it was given to secure." *Id.* at 499, 121 N.W. at 146. We agree that a mortgage is extinguished upon payment of the underlying debt. *Tobin*, however, did not involve the foreclosure of a mortgage. Payment of the mortgage is only one way to extinguish a mortgage. As provided by *Hitchcock*, a mortgage is also extinguished upon confirmation of the foreclosure sale.

Finally, CNB argues that ROI has waived the issue of whether CNB may recover the real estate taxes from the surplus because ROI failed to bring its theory

---

*such taxes are a lien upon the property against which they are charged.* That lien . . . is effective as of January 1 in the year when the taxes are levied. . . .

(Emphasis added.)

that the mortgage covenants cease to exist as of the date of confirmation before the trial court. *See Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140, 145 (1980). ROI argues that it is raising only a new "argument," not a new "issue," and therefore the argument is not waived. *See State v. Weber*, 164 Wis. 2d 788, 789-90 & nn.2 & 3, 476 N.W.2d 867, 868 (1991).

We do not need to determine whether ROI is raising a new "argument" or a new "issue" within the meaning of *Weber*. The general rule that appellate courts will not consider issues not raised in the trial court is a rule of judicial administration and is subject to exceptions. *Wirth*, 93 Wis. 2d at 443-44, 287 N.W.2d at 145-46. These exceptions involve questions of law which, though not raised below, may nevertheless be raised and decided by the court on appeal. *Id.* at 443-44, 287 N.W.2d at 145. Both parties have fully briefed the question of whether CNB may recover the real estate taxes from the surplus, and we believe that this is an important question of law that merits discussion.

## ATTORNEYS' FEES

CNB's surplus claim includes a total of $23,746.22 for attorneys' fees. ROI approved $8,493.47 in attorneys' fees incurred through August 3, 1995 by stipulation, but disputes the $15,252.75 in attorneys' fees incurred subsequent to August 3, 1995.

First, ROI argues that fees generated by two law firms are directly attributable to ROI's bankruptcy action, and as such, are not attorneys' fees recoverable under the mortgage. The mortgage provides that ROI "shall pay all reasonable costs and expenses before and after judgment, including without limitation, attorneys' fees . . . incurred by [CNB] in protecting or enforcing its rights under this Mortgage."

We do not need to reach the issue of whether these attorneys' fees were "incurred by [CNB] in protecting or enforcing its rights under this Mortgage." The mortgage also provides that it secures prompt payment to CNB of "interest and charges, according to the terms of [the May 25, 1993 business note]." The note provides that ROI agrees "to pay all costs of collection before and after judgment, including reasonable attorneys' fees (including those . . . incident to any action or proceeding involving [ROI] brought pursuant to the United States Bankruptcy Code) . . . ." Therefore, the mortgage secures the attorneys' fees incurred by CNB incident to ROI's bankruptcy proceeding, which occurred prior to confirmation.

ROI next argues that the benchmark standard of reasonableness for attorney fees in the noncommercial real estate loan context is five percent. *See Fellenz v. Gonring*, 113 Wis. 2d 228, 231, 335 N.W.2d 884, 885 (Ct. App. 1983). CNB's attorneys' fees were 10.8 percent of the stipulated amount of debt. ROI contends that absent evidence that warrants a substantial departure from the five percent benchmark, it was error for the trial court to find the entire $23,746.22 in attorneys' fees to be reasonable.

We reject ROI's argument. *Fellenz* discusses § 428.103(1)(e)2, STATS., which allows a creditor to charge attorney fees of five percent when foreclosing a first lien real estate mortgage securing $25,000 or less. This case involves the foreclosure of a real estate mortgage on a commercial office building that sold for more than $1,000,000 at the foreclosure sale. And ROI filed a petition in bankruptcy during the foreclosure action, making the proceeding more complicated. We do not see how this foreclosure action and proceedings covered by § 428.103(1)(e)2 are analogous.

Our analysis does not end with our conclusion that CNB's attorneys' fees were reasonable. To be recoverable from the surplus, the attorneys' fees must have been incurred before confirmation. As we have already determined, the mortgage terminated upon confirmation of the foreclosure sale, which occurred on November 14, 1995. Therefore, any attorneys' fees incurred after November 14, 1995 are not recoverable from the proceeds, although there may be an independent right to collect them under the note.

Because CNB cannot recover real estate taxes paid and attorneys' fees incurred after the date of confirmation from the surplus, we reverse the trial court's order for payment of the surplus and remand for the trial court to redistribute the surplus consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.